Our next case on our docket is Tim Nay v. BNSF Railway Company. So both attorneys are on video, I'm sorry, on audio. So Mr. Talmadge, would you like to state your appearance? Thank you, Your Honor. This is Phil Talmadge representing Tim Nay, the personal representative of the estate of Maria Gonzalez Torres and her son Issei. You may proceed. Thank you, Your Honor. I would ask to reserve four minutes of rebuttal time if I could. We're not getting any visual cues about the time that we have, so if you could alert me, I would appreciate it. I will do my best to do that, okay. Thank you so much. Again, Phil Talmadge representing the estate and Maria's son Issei. Maria, as the court knows, was killed and Issei was seriously injured when an Amtrak train traveling 70 miles an hour collided with her car at the Viola Crossing, a private at-grade crossing in suburban southwest Washington, as she was going to homes that she cleaned for a living. The train gave a too short and too late warning, audible warning. The crossing was inadequately signed and the sight lines for the BNSF track crossing on the road after it emerged from woods and crossed the tracks at an odd angle were hazardous, as experts opined. Overriding a magistrate judge's decision, the district court dismissed all claims against the railroad predicated upon its misperception of Washington common law and the FRSA preemption. We're asking that the court either certify the common law issues under Washington law regarding a duty owed at railroad crossings to their users or simply reverse the district court's opinion straight away. Mr. Talmadge? Turning first to the... Mr. Talmadge? Yes, Your Honor. Do you rely heavily on Mulkey, the Mulkey case which was decided, I think, in 1964? Should it matter to us that the Washington courts have hardly ever discussed or cited Mulkey since it was decided? Well, I think it was one of the reasons, Your Honor, we suggested that certification might be appropriate. There is the unpublished decision in Plotman, but a recent, as well, 2023 unpublished decision out of Division II of the Court of Appeals in Evans that does discuss what obligations are present with respect to railroad crossings. Mulkey is an older case, as the court observes, and Washington law, both statutorily and by common law, has evolved substantially since that time. Statutorily, Washington's adopted a pure comparative fault analysis for liability. And by common law, you have this change in Washington law on roadway design, an overarching common law duty recognized in the Keller case that speaks to an obligation on the part of roadway operators to provide a roadway safe for the traveling public, even potentially negligent users of such roadways. So the suggestion, at least in the Owens case, and certainly indicated in the Evans case that I mentioned, is that that overarching common law duty regarding roadway safety is something Washington courts have adopted, and they see railroad crossings as part of it. We don't have a case specifically on that point other than the mention in Owens and the implication of that in Evans since Mulkey. Well, let me ask – this is Judge Paez. Good morning. Good morning, Judge Paez. Let me ask you this. In your view, is Mulkey still good law? It is. And it's good law for this particular proposition. The district court labored under the misconception that because the Washington legislature repealed a criminal statute relating to warnings of railroad crossings, that somehow that repeal of the criminal statute took with it all of Washington's prior common law with respect to railroad crossings and audible warnings at such railroad crossings. And that's just flatly wrong. It's flatly wrong because Washington has made it very clear in the Kazanighi case that we've cited to the court that when a statute is repealed, unless the legislature expressly states that it is repealing the attendant common law, then the common law persists. And I would also note that in Mulkey, Your Honor, that the Washington Supreme Court made it clear that it was basing its decision not so much on that statute, but it was basing it on a common law principle that there was a duty with respect to audible warnings of railroad crossings. So this was something that not only have we indicated, but there's an attorney general's opinion from 1979, AGO 1979 No. 9, that confirms that proposition, that in fact the common law persisted notwithstanding whatever happened by way of statute as referenced in Mulkey. So the three theories that you advance for your negligence claim, are any of them preempted? No. Why not? If there's a state law that provides for such a claim. And of course, as we've indicated, that is in fact what happened here. And I should note that in the particular case we're talking about, the particular facts are significant. Federal law 49 CFR 222.21 requires three warnings, three audible warnings. There was only one given by the Amtrak train in question, and it was too late. It was one second before it smacked her at 70 miles an hour. So you have a situation where that audible warning claim persists. The adequacy of warning devices issue, again, something that Washington common law recognizes without any question. You have cases like Zwink and Riley that even impose a duty upon parties that have the opportunity to do so, to go to the Washington Utilities and Transportation Commission and demand more aggressive warnings at a particular site. That claim is not preempted because this is a private crossing, and no federal dollars are involved in it. So it's, again, a matter of Washington common law that's at issue. And you have very unambiguous testimony from two experts that this particular crossing was particularly extra hazardous. It was extra hazardous because it should have been closed, and Mr. Ogden so testified. It should have been the subject of more active warning devices. And lastly, it should have, if not failing either one of those things, it should have had more passive warning devices, not to be lost sight of. There were no on-the-ground painted warnings coming here, and the sign that we're talking about that was located a mere 10 feet away from the tracks was positioned at an odd angle to the road as the road came out of this kind of wooded chute and then around a curve to this point where the sign was improper. And then lastly, the issue of sight lines. There's a 49 CFR 213.37 says that any claim relating to vegetation or obstructions on the tracks themselves is preempted. But our argument doesn't have anything to do with that. It has to do with how this particular roadway was configured, and vegetation obscured the ability of Maria Gonzalez-Torres to see the train in any appreciable way as she approached this oddly configured chute-like process to get her to the sign at issue. I just have one question related to this, one further question. That is, as she came down the hill and the curve approaching the tracks, the foliage that was on either side, is that foliage on property owned by the railroad or the right-of-way, or is it the private property's foliage? Who owns that land where it obscured the sight line as she was coming down the road? As I understand it, Your Honor, I think it was a little of both. Some of it was associated with the roadway, but some of it was associated with land that was in the possession of the railroad. But I don't have a specific site to the excerpts of record for you on that proposition, and I can provide that subsequently. Let me ask you, Mr. Tallmadge, it seems like, based on your briefing, you are asking the court to read Mulkey broadly and to impose a general duty of reasonable care at private crossings, rather than a narrower duty to sound a horn at private crossings depending on the circumstances. Am I reading that correctly, and what's your authority for that? Well, here's the argument, I think, Your Honor, directly in response to your question. Washington law provides for a general duty of care on the part of railroads to users of railroad crossings, particularly as to ultra-hazardous crossings, and the authority for that is the Porter case and the Hewitt case of the Washington Supreme Court, both older decisions. Specifically with respect to warnings, you have not only Mulkey, but to go back a little bit prior to that, the Goodner case, which states very specifically that the duty is that the warning must be adequate under the circumstances. So it takes into contemplation the nature of the crossing and what's going on at it. So there was a general duty, particularly more aggressive as to extra-hazardous crossings, but then specifically with respect to audible warnings, cases like Goodner, Mulkey, Plogman, and Evans, all provide that under those circumstances there's an obligation to provide a warning that's adequate under the circumstances, and after the federal CFRs that are in place, that warning that's adequate under the circumstances is a three-part warning that federal regulations require, which was not given by Amtrak's train in this particular case. One last thing, if I could turn to, the district court also labored under a misconception about Washington laws to proximate cause. It concluded as a matter of law that the sole proximate cause of the accident here was Maria's conduct. Again, there's no question but that Washington now is a pure comparative fault state, but that effort by the district court truly intruded upon the function of the jury in deciding whether or not her conduct was the sole proximate cause, because if we're correct that the warning should have been given or that there should have been better, the audible warning should have been given if there were better warning devices that should have been in place, or if the crossing itself indeed should have been closed or it should have been made safer, all of those would have precluded the collision that's at issue here, which the jury could determine in its process. In cases like Eichler, and again the Evans case, the 2023 decision of the Division II of Washington's Court of Appeals, make that clear that this is a classic issue of fact. I would hazard to point out to the court the very fact that Maria Gonzalez-Torres slowed her vehicle down from 16 miles an hour to 3 miles an hour at the time of the collision, that she turned the phone that the railroads have made much about over to her son, suggest that she was concerned about the crossing and that had she been given sufficient information about it, sufficient warning about it, she would have heeded that warning, making proximate cause clearly a question of fact for the jury. I would note as well that we have that information involved in the study of the crossing, in which 85% of the people coming to this crossing simply failed to stop or do a so-called California stop at the site, because of the configuration of the site, all of which suggests that this issue of proximate cause is truly one for the jury. In sum, the district court here basically misperceived Washington's common law, and we believe the court could decide what the trend in Washington's common law is if it wishes to do so, but we've affirmatively asked the court to certify the issue to the Washington Supreme Court if it deems that necessary. Did you reserve the rest of your time? You're down to two minutes. I do, Your Honor, and we would ask that the court either certify or reverse the district court order straightaway. Thank you very much. Mr. Yates, can you please state your appearance and proceed? Yes. My name is Andrew Yates, and I represent the Appalachian BNSF, Amtrak, and Mr. Matlock and Mr. Birch. There was no requirement to sound the horn on approach to the private Viola Street crossing. The vegetation was well controlled. It's undisputed that there was a sight line of over 2,000 feet that was unobstructed from the stop sign looking in the direction from which the train was coming. The crossing was protected with a stop sign, cross buck, and DOT sign. That is exactly the protections that are specified in BNSF standard plan, what the FRA requires, and what the uniform traffic control device manual, which has been expressly adopted in Washington, specifies needs to be in place at that crossing. Can I ask you about the failure to sound the horn claim? It looks like you rely on VEET versus Burlington North Santa Fe Corporation to argue that we shouldn't look to pre-Federal Road Safety Act cases in determining whether a common law duty exists, but it appears that VEET involved an excessive speed claim that was preempted by FRSA. If we disagree with you that plaintiff's claims are preempted, I wanted to find out your position on whether or not you agree that we can properly look to pre-Federal Road Safety Act cases about Washington common law. Yes, and the answer depends slightly on which particular claim and Federal regulation we're talking about. On the horn sounding claims specifically, it's very clear that the regulation does not require the routine sounding of horns at private crossings like this one. The Federal standard of care applies here, and this is clearly preempted. We disagree because I think the provision states that the states can direct or can put a law in place that says that there needs to be a horn, and the Federal regulation just says what kind of horn sound needs to be made. So, again, just assume for the moment that I might disagree with you on that. I wanted to find out if you thought we could look at the Washington common law. Correct, and the answer is not as the appellants are proposing it and not in any way that requires a case-by-case determination by the train crews. I would submit still in order to survive preemption, a more stringent state law can only exist if it's necessary to eliminate an essentially local safety hazard. That's incredibly narrow. It applies to things like a herd of cattle or a child who wanders onto the track or a flood. We've cited a case law in our briefing that every single feature of this crossing that the estate argues makes it an essentially local hazard or ultra-hazard assistance, specifically held not to constitute that. And I would say even going more fundamentally, the FRSA's overarching goals are uniformity and to promote rail safety. And it's hard to imagine something that would be more at odds with those goals than requiring train crews traveling on multi-state routes to make individual case-by-case determinations, whether the sounding would be required as an individual private crossing. It is true. What Veit says is that this was in reference to the Godner case and excessive speeds, but they simply provide no guidance on the adjudication of those claims. And as the court has inquired of Mr. Talmadge, Mulkey and the decisions that are the basis for what used to be the common law duty, which as formulated in those decisions, couldn't survive FRSA preemption. But even so, those are limited to their specific facts. For example, in Mulkey, there's the bean harvest. It was known to this specific crew that the crossing was in use. And importantly, it involved directly conflicting evidence in which there is none in this case. And we've pointed out in our brief the legislative history and how this was all repealed in response to the FRSA in 2007. Washington could have enacted a statute that would be consistent with the federal foreign sounding regulations, but the point is it did not. This is Judge Pius. Could I ask you a question just to follow up on Chief Judge Borgia's question? Is it assuming again, as Judge Borgia proposed, that you assume that preemption is – there might be some disagreement on whether or not the preemption would apply to the horn sounding negligence claim. Is it your position that under Oregon law, under Washington law, that as a matter of law, there was no negligence here? Yes. How do you – because that's essentially what the district – well, you could read the district court's opinion as saying that just as a matter of law. And I find that hard to accept. Maybe you can help me understand your position. Certainly. So first of all, the warnings – I think it's important to frame the question correctly. And we believe the rider decision from the Fifth Circuit is instructive on that point. And that's – the warnings have to be adequate to warrant, not adequate to prevent every possible accident at every time. And here, we have a crossing that's protected in accordance with any possible standard that could apply. And the undisputed evidence from the video, from the event recorder, from everything is that Ms. Torres ignored those warnings and traveled directly to the path of the train. On those facts in this case, the summary judgment should be affirmed. Are there other cases where the facts could be different and it should go to the jury? Yes. But this is not one of those cases. So you rest your argument there on her negligence. Is that right? We rest that on that and that being the sole cause of this accident. What do we do with the fact that Washington has a pure contributory negligence doctrine? It's necessary to examine the record in this case. And there is no evidence of railroad negligence to weigh against Ms. Gonzalez-Torres' evidence. And further to that, she had an undisputed duty to stop at this stop sign. And it's undisputed that she failed to do that. This is not one of the cases from the pre-FRSA common law days that the estate relies on where it was dark, the weather conditions were adverse, there were genuine disputes about whether the crossing protections were obscured, covered up, or whether the lights were the right color or anything like that. There's simply no dispute. Ms. Yates, this is Judge Murguia again. The record here includes, you know, among other things, ample photographs, expert testimony, and layperson testimony from Mrs. Gonzalez-Torres' son and coworker. It seems like we have to be the evidence, the light most favorable to the plaintiffs. Why wouldn't it be reasonable for a jury to find that any breach by a defendant was a but-for cause of the accident? Yeah, so that depends, again, on the specific record here. Taking the expert opinions, they're conclusory statements of law. They aren't based on facts or measurements or any visits to the site. None of the photographs that they rely on were taken from the vantage point of the stop sign. Were the facts different, I would certainly agree that there could be something that could go to the jury, viewing it in the light most favorable. But the facts on this record aren't there. Well, that's what you said, but isn't it for a jury to decide on whether the expert's testimony is deficient or not? I mean, or whether it's compelling or credible? And, guys, I'm not sure I understand what you're saying. What I'm saying, certainly in many cases, it is. Our position is in this case, it doesn't rise to that level. We've cited the cases where things that are typically jury issues, like expert testimony, approximate cause, scope of a duty, can all be decided as a matter of law when the facts permit only one reasonable conclusion. And we submit that the factual record in this case is such a case. Thank you. Who owns Southwest Viola Street and the land between that Viola Crossing and Evergreen Highway? None of the railroad, or none of the parties in this case. I understand. Do you know who owns that? I do not. I don't think that the record answers that question. None of those entities were brought into the case by the estate. The railroad doesn't own, control, have any duties with respect to that segment of land. And the estate hasn't shown any authority or any facts that would support the duty to do so. And, again, on the— Because it's a private crossing, it's considered a private crossing, do we assume that it's owned by the community there? The court could so assume, yes. And the point is that there's no obligation on the railroad to go and work with those landowners. And, again, the vegetation control regulation, again, is one that defines the federal standard of care with respect to the railroad's obligation to control that vegetation. That extends only to vegetation that's on or adjacent to the roadway. The estate has conceded that portion of the claim. So let me ask you, I'm trying to—reviewing this, you know, what constitutes— trying to figure out what constitutes the railroad's right-of-way. And as far as you know, does a railroad ever have duties beyond the right-of-way? Not with respect to vegetation control. And what is typically the case—and, again, I submit the record is not clear on this, and it doesn't need to be, but typically it's 100 feet in either direction of the center line of the rail. And here, on just a basic evidentiary basis, there was an unimpeded view of over 2,000 feet from the line of the stop sign in the direction the train was approaching from. Let me go back to the inadequate warning device claim, if I could. Mulkey and other cases have stated that a warning should be adequate for the circumstances. And here, plaintiffs essentially argue that the passive stop sign is an inadequate warning for the circumstances. So I wanted to ask you, can't Mulkey apply, or should it apply, beyond the failure-to-sound-the-horn context? No, it should not. I don't—our position is there's no way to apply that general duty in a way that would ever be consistent with or survive the governing FRSA preemption principles. Let's just assume that it's not preempted and answer the question, and if you could answer the question. Sure. The only record evidence would still require affirming summary judgment because with respect to the inadequate warning device claim, even in the federal register provision of the FRA safety notice the estate relies on, it's recognized that states can regulate private crossings by having a cross buck, stop sign, and DOT sign. That is exactly what was in place at this crossing. And there's simply no evidence that it was ultra-hazardous. The only accident in the history of time was 25 years ago, and fortunately it was a low-speed collision, and it involved a vehicle coming from the other direction than the one Ms. Gonzales-Torres was traveling. So even if there is no preemption of that or any other claim, our position is that the record evidence requires affirmance of the summary judgment because of all of the undisputed facts here. Okay. Thank you. Thank you, and I see that I'm out of time, so unless the panel has additional questions, I will let Mr. Talmadge give his rebuttal. Thank you, Mr. Yates. Mr. Talmadge? Thank you, Your Honor. Your Honor, in response to some of the court's questions, I would observe, first of all, that the expert testimony here was the subject of a motion to strike by the railroads, and the trial court denied that. That's in excerpts of records 75 to 101. So those opinions of Mr. Ogden and Ms. Gill remain viable for the district court, and taking the facts and reasonable inferences from the facts and the light most favorable to the plaintiff as the non-moving party here, the plaintiffs as the non-moving party, those expert declarations should stand in creating a question of fact about the breach of duty by the approximate cause as to the railroad's conduct. What you heard from Mr. Yates was interesting because a number of things jump out at me. The first is you didn't hear anything about the repeal of Washington's common law or the standard that the Washington Supreme Court has established that require for the repeal of a common law through a statutory repeal that the legislature must expressly reject the common law. You don't have that here. You had the legislature repeal a criminal statute regarding warnings of railroad crossings, and nothing in that repeal had anything to do with civil common law liability for such railroad crossings. You didn't hear Mr. Yates have any answer on proximate cause to the question of the Eichler decision, a very important decision with respect to proximate cause, particularly after Washington's adoption of pure comparative fault. And in response to your question, Judge Murguia, about what about the reliance on pre-FRSA common law cases, I think you can rely on pre-Washington common law cases like Goodner, which he acknowledges provides for a requirement as to audible warnings that it be reasonable under the circumstances, a factually rich question. But moreover, you have a post-FRA case, Evans, the Division 2 case that I've referenced, that he has not even responded to. The Evans case makes clear that there was a duty owed to the traveling public with respect to a railroad crossing in the city of Tacoma, and that standard clearly applies. And then lastly, with respect to the notion that essentially any horn claim would be preempted, as Mr. Yates' position, I think, absent some peculiar and essentially local safety hazard, in this particular case you have trains traveling at 70 miles an hour, you have a road that's incredibly unusual going through this kind of a shoot of trees that then turns at a weird angle, and the sign that he champions is askew to the driver as the driver approaches that sign. So you have in that particular set of circumstances an incredibly hazardous circumstance. Washington law has provided a general duty owed to the users of railroad crossings from railroads, but more to the point, an even more particularized duty when that crossing is extra hazardous. And cases like the Riley case and Zwink suggest that apart from whether the railroads own this particular property that we're talking about between the street and the tracks, they had a duty when they understood the railroad crossing to be dangerous to go to the Washington Utilities and Transportation Commission and upgrade the nature of the protections that were available to the public there. Thank you. In this case... Thomas, do you want to make... I'm sorry, Your Honor, thank you. Do you want to make your concluding statement? I would, and thank you, Your Honor. We'd ask that the court either certify the issue of Washington's common law, which is central to the question of federal preemption here, or straightaway determine that the district court erred and reverse the district court summary judgment. Thank you. Thank you, Mr. Talmadge and Mr. Yates. I appreciate your presentations here today. The case of Timnay v. BNSF Railway Company is now submitted.
judges: MURGUIA, PAEZ, NGUYEN